# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 18, 2011 Session

## STATE OF TENNESSEE v. RANDALL KELVIN MADISON

**Appeal from the Criminal Court of Davidson County**
**No. 2008-D-4188      Steve Dozier, Judge**

_____

**No. M2010-00059-CCA-R3-CD - Filed May 4, 2012**

_____

A jury convicted Randall Kelvin Madison ("the Defendant") of twenty-two counts of rape, three counts of aggravated statutory rape, and one count of forgery. The trial court subsequently merged several of the offenses so as to leave in place twelve counts of rape and one count of forgery. After a sentencing hearing, the trial court ordered the Defendant to serve an effective sentence of thirty-five years. In this appeal, the Defendant challenges (1) the trial court's ruling under Tennessee Rule of Evidence 404(b) that evidence of his uncharged bad acts was admissible; (2) the State's election of offenses; (3) the sufficiency of the evidence; and (4) his sentence. We hold that (1) the Defendant is not entitled to relief from the trial court's Rule 404(b) ruling; (2) the Defendant has not demonstrated that the State's election of offenses was fatally deficient; and (3) the evidence is sufficient to support his convictions. We also affirm the trial court's sentencing decisions. Accordingly, we affirm the Defendant's convictions and sentences.[1]

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Criminal Court Affirmed; Remanded

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Joy S. Kimbrough, Nashville, Tennessee, for the appellant, Randall Kelvin Madison.

Robert E. Cooper, Jr., Attorney General & Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Sharon Reddick and Jennifer McMillen, Assistant District Attorneys General; for the appellee, State of Tennessee.

---

[1] We nevertheless remand this matter to the trial court for correction of the judgment orders to reflect the ordered mergers.

**OPINION**

**Factual and Procedural Background**

The Defendant was indicted in December 2008 on twenty-two counts of rape, three counts of aggravated statutory rape, and one count of forgery. All of the rape counts involved the minor male victim R. H.[2] Counts 1 and 2 each allege that the rape occurred "on a date between August 1, 2004 and September 30, 2004, in Davidson County" and that the rape "was accomplished without the consent of" R. H. Counts 3 through 22 each allege that the rape occurred "on a date between August 1, 2005 and September 30, 2006, in Davidson County." Of these charged offenses, Counts 3 through 12 each allege that the rape was committed with force or coercion, and Counts 13 through 22 each allege, in the alternative, that the rape was committed by fraud. Count 23 alleges that, on June 8, 2006, the Defendant forged "a writing purported to be the act of Dr. Theodora Pinnock" with the intent to harm R. H. Counts 24 through 26 each allege that the Defendant committed aggravated statutory rape against R. H. "on a date between July 1, 2006 and September 30, 2006, in Davidson County."[3] The Defendant was tried before a jury on May 18 - 21, 2009.

A brief timeline will assist in placing the proof in context. The victim's birth date is October 26, 1989. Accordingly, he turned fourteen on October 26, 2003. The victim's freshman year in high school began in the late summer of 2004; his sophomore year began in the late summer of 2005; his junior year began in the late summer of 2006; and his senior year began in the late summer of 2007. The victim began working at Academy Sports in the late summer or early fall of 2006, shortly before he turned seventeen on October 26, 2006. Counts 1 and 2 of the indictment therefore refer to a period of time when the victim was fourteen years old and at the beginning of his freshman year in high school. The remainder of the counts refer to a period of time when the victim was fifteen and sixteen years old.

At trial, the victim testified that he was currently nineteen years old and that he lived with his mother, T. D.[4] The victim has a younger brother and a younger sister whom his mother adopted several years earlier after foster-parenting them. The victim explained that his father lived in Antioch but that he had contact with his father only "now and then."

---

[2] This Court identifies victims of sex crimes only by their initials.

[3] Aggravated statutory rape became a crime on July 1, 2006. See 2006 Tenn. Pub. Acts ch. 890 §§ 5, 26.

[4] In an effort to protect the victim's identity, we also refer to his mother by her initials.

The victim testified that he was active in his church, which he had been attending his "whole life." He met the Defendant through church when he was in the eighth grade. The Defendant became a friend of the family and acted as "a mentor to [the victim] and the other youth in the church." The victim started spending time with the Defendant outside of church, including attending the Defendant's family functions, going to movies, and going out to eat. When T.D. began traveling overnight for her job, she suggested the victim spend those nights with the Defendant because she did not want the victim staying at home by himself.

According to the victim, the Defendant lived by himself in a two bedroom house. The first night the victim spent with the Defendant, he was fourteen years old and a freshman in high school. It was a Monday night in the early fall of 2004 and they watched football together. After the game, the victim went to bed in the second bedroom. During the night, the victim woke up to find the Defendant "on top of [him] with his back facing [him]." The victim explained that the Defendant was "moving," which the victim described as "grinding back and forth." The victim stated that his (the victim's) shorts were on, but that his "privates were out." The victim described their contact as "[s]kin to skin." When asked where his "privates" were in relation to the Defendant's, the victim responded, "[i]n his anal region." When the Defendant realized the victim had awakened, the Defendant left the room. The victim then got up, went to the bathroom, and went back to sleep. The next day, the Defendant took the victim to school "as if nothing happened." They did not speak about the incident.

The victim returned home that afternoon because his mother was back from her trip. He did not say anything to her about what had happened. The victim explained his silence: "Because my mother, she's the type that when it comes to her children she doesn't play. She will take a life for her children. And if I would have told her what happened, she would have taken his life." The victim told no one else about the incident.

The victim continued seeing the Defendant as before and did not change his conduct toward the Defendant because he was concerned that people would "question" a change in his behavior. Roughly a month later, his mother went out of town again and again suggested that he spend the night with the Defendant. The victim testified that he did so because he "didn't have anywhere else to go." The victim testified that, as occurred previously, he awoke to find the Defendant straddling him. When the victim asked him what he was doing, the Defendant did not reply but left the bedroom. The victim stated that, during the encounter, his penis was in the Defendant's anus. The next morning, nothing was said and the Defendant took the victim to school. The victim testified that he had not consented to this behavior on either occasion.

The victim spent five to seven additional nights with the Defendant during the ninth grade (2004-2005), but nothing more occurred that school year.

Also during his freshman year, and continuing through his sophomore year (2005-2006), the victim frequently would meet the Defendant after school at the Defendant's place of employment in downtown Nashville. On the afternoon of May 9, 2005, while the victim was still a freshman, the victim told the Defendant that he wanted to use the Defendant's work computer to look for a summer job. Instead of looking for a job, however, the victim used the Defendant's work computer to visit a pornographic web site ("the Computer Incident"). The Defendant later confronted him about what had happened, explaining that his office had scanned the computer and discovered the visit to the website. The victim acknowledged what he had done, and the victim subsequently spoke with Dr. Pinnock, the Defendant's supervisor, about his activities. The victim acknowledged to Dr. Pinnock that he had used the computer for this purpose, and "signed some paperwork saying that [he] did it and that [he] agreed that it wouldn't happen again." The victim "thought that was the end of it." The paperwork that the victim signed was admitted into evidence. It is titled "Statement" and sets forth the following:

> I, [R. H.] on May 9, 2005 sat at the desk of [the Defendant] and enter[ed] the internet without his permission. Upon entering the internet I went to several porn websites before he returned to his desk. Once he returned I immediately closed the sites but he was able to view one and asked what was I doing. He went on to explain to me that he could lose his job behind [sic] this incident. I do apologize to [the Defendant] and those involved for the actions taken by me.
>
> I therefore affix my signature upon this statement this 11th day of May, 2005.

The statement is also signed by a notary public.

That summer of 2005, between the victim's freshman and sophomore years, the victim was engaged in volunteer activities and spending time with his family in Mississippi, so he did not see the Defendant. Their relationship resumed with the new school year, however. During a weekend early in the new school year (the fall of 2005), the victim was again spending the night with the Defendant because the victim's mother was out of town. The Defendant brought up the Computer Incident and told the victim that the Defendant "could lose his job" and also that the victim "could go to jail no less than seven years [because he had] looked up pornography on a State computer." At this time, the victim's mother was in the process of trying to adopt the victim's younger brother and sister. The Defendant pointed out to him that, if he (the victim) went to jail, he would not be available to help his mother with the children. This disturbed the victim because he "would do anything" for his mother.

He told the Defendant,

> no, no, no, you can't send me to jail. You can't send me to jail. I have to be here for my mother. I have to help her raise these two kids. I'm the oldest in the house. I really need to – she really needs me to help her with these kids.

He testified that he "was basically begging [the Defendant] not to send [him] to jail."

After this conversation, the victim went to take a shower. While he was in the shower, the Defendant entered the bathroom and got in the shower with him. The victim assumed that the Defendant wanted sex and also assumed that he had to acquiesce to the Defendant's wishes in order "to be here for [his] mother and these kids." However, all the Defendant did was wash the victim's body.

In addition to this weekend, the victim spent most of his Wednesdays after school during his sophomore year with the Defendant. The victim would arrive at the Defendant's workplace and then spend time at the Defendant's residence before they would go to evening church activities. The victim testified, "And while I was at his house pretty much every Wednesday all of my sophomore year we would have sex every Wednesday at his house." The victim described this sex as him penetrating the Defendant. Between five and ten times, the Defendant would perform oral sex on the victim first in order to give the victim an erection. After the sexual encounters, the victim would "go wash up and then [they] would leave and go to the church."

The victim testified that he did not want to be having sex with the Defendant, but that every time he tried to end their sexual relationship, the Defendant would threaten him in some way. The victim stated that the Defendant would bring the Computer Incident "back up" and that "every time [the victim] would pull away it was always a different threat." The victim said, "It was always something like letters would be sent to my house, I would get e-mails saying you should do this or you need to do that."

The sexual relationship continued into the summer following his sophomore year. At the beginning of his junior year, the victim started a job at Academy Sports in the Rivergate area in Davidson County. The victim testified that he and the Defendant had sex in the bathroom at the victim's job site "a couple of times." Also, when asked if he and the Defendant ever had sexual relations in Nashville other than at the Defendant's house, the victim responded, "I think it's happened in my house twice."

When the victim tried to end the sexual relationship at the beginning of his junior year (the late summer/early fall of 2006), the Defendant told him "whatever is in the dark shall come to light." The victim became concerned that the Defendant would tell people at their

church that the victim was a homosexual. The victim testified, "I didn't want anybody thinking I'm a homosexual . . . because I'm not. And I didn't want anybody looking at me differently because of this." The Defendant also claimed to have made tape recordings of voice mail messages that the victim had left him. The Defendant gave him a tape, which the victim destroyed after listening to it. The Defendant told him he had made multiple copies, however, and the victim was afraid the Defendant would use the tapes to convince his mother and people in the church that he was a homosexual. At about this same time, the victim's mother confiscated the victim's cell phone because of a bad report card. She found a voice mail message from the Defendant saying that the Defendant "loved [the victim] and stuff like that." T. D. confronted the victim and told him to cut all contacts with the Defendant. The victim did not cut all contacts, however, and although he told the Defendant about his mother hearing the voice mail, the relationship continued and moved to the victim's job site and then outside of Davidson County.

In July 2007, almost a year later, the victim finally told his mother about his relationship with the Defendant. They then went to the Metro Police Department, taking a collection of e-mails and other correspondence associated with the Defendant. The victim answered affirmatively when asked on direct examination if "[t]he nature of those e-mails, is that the nature of the type – kind of things he would say to you basically from the beginning after he caught you looking at the pornography?" The victim also explained, "if I would make him mad, he would be like you need to do this or you need do that or I would do this or I would do that." The victim also explained his acquiescence to the Defendant's demands: "I was looking for the best thing for me and my family and I feel that I did it because I was helping my family as well as [my younger brother and sister] 'cause I could see them going back to children's services . . . [a]nd so I did that for me and my mother." The victim also testified that he believed he would go to jail if he ended his relationship with the Defendant.

On cross-examination, the victim acknowledged that he stayed with another friend of the family from church the first time his mother went out of town. He also explained that he had received e-mails from the Defendant that predated the ones he turned over to the police, but that he had already deleted those from his inbox. He reiterated that the first sexual incident occurred during his freshman year. He also clarified that he was sixteen years old, about to turn seventeen, when he began working at Academy Sports at the beginning of his junior year.

T. D. testified that she was a computer systems analyst and that her work began taking her out of town "frequently" during the period September 2003 through March 2004. The victim was "about 13, 14" during this time. While she was out of town, sometimes the victim stayed with T. D.'s brother and other times he stayed with the Defendant. She did not develop any concern about the victim's relationship with the Defendant for several years.

She became concerned, however, when a letter dated June 8, 2006, on State letterhead came in the mail addressed to the victim. She read the letter and, although it purported to be from a Dr. Pinnock, she became suspicious that it was actually from the Defendant. The letter, admitted at trial, refers to an "internet violation" made on the Defendant's computer by the victim and that the Defendant's job was thereby at risk. The letter recites that the Defendant had decided not to pursue the matter against the victim, but asserts that the "division/State of Tennessee still can feel the need to press charges if found necessary."

T. D. called Dr. Pinnock and confirmed that Dr. Pinnock had not written the letter. She then spoke with the Defendant about the letter, and he told her that he suspected a coworker was responsible for it because they were upset about his high salary. She also had a conversation with the victim about the letter, and he told her about the Computer Incident and that he and the Defendant had spoken with Dr. Pinnock about it.

T. D. testified that she also received a letter addressed to her that was signed "B" and which claimed the victim was attending clubs while visiting his father. T. D. threw this letter out after she asked one of the victim's friends, whose name started with "B," about it and he denied having written it. She also received a letter that purported to be from a girl that the victim was dating. T. D. described the letter's contents as "crazy," and, when the victim disavowed any knowledge of why his girlfriend would write such things, they threw the letter out.

T. D. testified that she became particularly concerned about her son's relationship with the Defendant in October 2006, at the time the victim began working for Academy Sports. She had the victim's cell phone and listened to a voice mail that the Defendant left on it. She recalled that the message included the words, "you felt good last night." She spoke to the victim about it, but he explained it away. She then called the Defendant and threatened him "that he better stay away from my child or I would have the police over here before he knew it." The Defendant hung up on her and, to her knowledge, her son had no further contact with the Defendant.

After she discovered another phone call from the Defendant in July 2007, she confronted the victim and he confessed his sexual relationship with the Defendant. T. D. testified that the victim told her the relationship started when the victim had accessed the pornographic website on the Defendant's computer at work. The victim told her that the Defendant had threatened him.

T. D. stated that the victim's freshman year in high school was 2004 to 2005 and he turned 15 in October 2004. His sophomore year was 2005 to 2006 and he turned sixteen in October 2005. His junior year in high school was from 2006 to 2007, and his senior year was 2007 to 2008. She also explained that he was retained a year in the seventh grade.

On cross-examination, T. D. stated that, after the victim's father left the family home in July 2003, the victim saw his father on average about five or six times a year.

Dr. Theodora Pinnock testified that she was employed by the State of Tennessee Department of Health as its Director of Maternal and Child Health. The Defendant was under her supervision and was employed as an administrative services assistant. She recalled the victim's visiting the Defendant at the workplace and the Defendant's introducing the victim to her as his godson. In May 2005, the Defendant told her that the victim had accessed a pornographic website on the Defendant's work computer. Dr. Pinnock told the Defendant that persons other than state employees should not be using state computers. She spoke with the victim about the incident, and he acknowledged his actions. The victim apologized and executed a notarized statement of his apology. Dr. Pinnock told the victim that the incident was then "over." The Defendant was not disciplined over the incident.

According to Dr. Pinnock, the Defendant told her that he had discovered the website visit himself. She was not aware of any "scan" of the Defendant's computer. Dr. Pinnock denied writing the letter dated June 8, 2006, purporting to be from her. She also denied having given the Defendant permission to draft the letter and denied having ever given him permission to sign her name.

Bryan Doersam, a detective with the Metro Police Department Sex Crimes Unit, testified that he investigated the instant crimes after the victim and the victim's mother came to the office in July 2007 and filed a complaint against the Defendant. At that time, the Defendant was forty-eight years old and the victim was seventeen. The victim provided Det. Doersam with numerous documents including letters and e-mail correspondence. The victim also provided voice mails from the Defendant that had been left on the victim's phone. In furtherance of the investigation, the victim was outfitted with a wire and then had a conversation with the Defendant. This conversation was recorded and monitored by Det. Doersam, who described the conversation as follows:

> The nature of that body wire conversation was [R.H.] confronting [the Defendant] about this relationship; him not wanting to be a part of that; [the Defendant's] overall theme was him continuing the fact that this is your fault, [R. H.], I only did these things, you know, because I wanted you to be truthful with me.

> He admits to calling [R. H.'s] mother at work. He admits to having someone call his house trying to keep this relationship going. He admits to sending letters to keep –

-8-

Det. Doersam was interrupted by an objection, but later testified that, during the monitored conversation, the Defendant admitted that he and the victim had sex "[a]nd that he thought all this was [R. H.'s] fault; that the stuff with him looking at pornography at his work had kept him from getting raises, had kept him from getting promotions, that that was all [R. H.'s] fault." The Defendant also asserted that the victim was facing jail time.

The Defendant was subsequently taken into custody at his workplace and Detective Carrigan advised the Defendant of his Miranda rights. Det. Carrigan then walked the Defendant to the Criminal Justice Center, which was only a couple of blocks away. On the way, Det. Carrigan asked the Defendant "what he thought we were there for." The Defendant asked him "if it was about [R. H.]." Det. Carrigan did not know the victim's identity at that time, so he replied, "tell me about [R]." According to Det. Carrigan, "a[t] that point, [the Defendant] started discussing his relationship with [R. H.] and admitted to a sexual relationship with him." Det. Carrigan stated that he audio-recorded this conversation. Once they reached the Criminal Justice Center, they continued the interview and switched to a video recording. The video recording was played for the jury, and a transcript was also provided.

During the interview, the Defendant admitted that, as of the time that R. H. accessed pornography on his work computer, their sexual relationship had been ongoing for about a year. He clarified that the first time they had sex was on a Monday night during the fall of 2004 or 2005. It was R. H.'s first visit to the Defendant's house. He described this initial sexual contact as "his penis in me." He later stated that, on this first occasion, the victim first had anal sex with him and then he had anal sex with the victim. Their sexual relationship continued into May of the following year when the incident with the Defendant's work computer occurred. The Defendant stated that, during this interval, he and R. H. had sex "about 30" times.

The Defendant explained that the victim came to stay at his house when the victim's mother was out of town. The Defendant stated that these visits occurred a couple of times a month. On a "couple" of occasions, the victim stayed two nights on these visits.

The Defendant said that the victim was lying when he claimed that the Defendant started their sexual relationship. According to the Defendant, the victim initiated the first sexual episode. The first episode occurred on the Defendant's couch, not in the spare bedroom. The Defendant stated that the last time he had sex with the victim at the Defendant's house was in October 2006.

The Defendant stated that the last sexual contact he had with the victim was in a hotel in Sumner County on July 7, 2007. The Defendant admitted that he and the victim had been to this hotel about five or six times, the first time being in January 2007. The Defendant

explained that they moved their sexual relationship to Sumner County because the victim's mother had demanded that they stop speaking to each other. The victim had begun working at Academy Sports in Rivergate and suggested to the Defendant that the Defendant contact him at his job. The hotel was nearby. The Defendant would visit the victim on the victim's lunch break.

The Defendant stated that he performed oral sex on the victim twice over the course of their relationship. Both of these incidents occurred in Davidson County. The victim performed oral sex on the Defendant three or four times.

The Defendant admitted that he and the victim exchanged e-mail correspondence. When confronted with the documents provided by the victim, the Defendant acknowledged his authorship. He also admitted having written and signed the letter purportedly from Dr. Pinnock and acknowledged having sent a letter to the victim from a fictitious attorney, again reminding the victim of the Computer Incident. He sent the victim these letters in an effort to intimidate him into continuing their sexual relationship. The Defendant also admitted writing letters that purported to be from a girlfriend of the victim's and from a "concerned neighbor." He wrote these letters to get the victim in trouble with his mother in retaliation for the victim's lying to him. When Det. Carrigan asked,

> And then the other letters you sent on your own, and other e-mails you sent on your own were also for that same purpose of intimidating, threatening, coercing him to continue having sex with you, or else I'm coming out with all this other stuff[,]

the Defendant replied, "Yes."

The Defendant explained that he had taped messages that the victim had left on his voice mail and had threatened the victim with turning the tape over to the victim's mother if the victim refused to continue their relationship. He also wanted the tape to prove to the victim's mother that "this wasn't something that was started by me." The Defendant denied that he was interested only in continuing the sexual aspect of their relationship and averred that he had some "pretty deep feelings" for the victim.

The Defendant explained that he felt the victim trying to pull away from him after the Computer Incident. The Defendant also admitted to having become jealous when he learned that the victim was spending time with girls. The Defendant wanted the victim to be "faithful" to him.

Toward the end of the interview, the following colloquy transpired:

CARRIGAN: November of '04 you started to have sex with him at your house.

[DEFENDANT]: Right.

CARRIGAN: That night he had anal intercourse with you, you had anal intercourse with him.

[DEFENDANT]: Right.

The Defendant also reiterated that, between November 2004 and May 2005, he and the victim had sex about thirty times. Between May 2005 and June 2006, they had sex in the "general range" of one hundred times. The last time they had sex at the Defendant's house was in October 2006 when the victim put his penis "in" the Defendant. In January 2007, they started having sex in Sumner County, about once or twice a week depending on the victim's work schedule. The Defendant also admitted that he had sex with the victim once under a bridge near the victim's house. This episode consisted of the victim placing his penis in the Defendant.

In addition to giving a statement, the Defendant consented to a search of his vehicle and home. In the Defendant's home, Det. Doersam found "an application for a criminal arrest warrant that was filled out and had the victim's . . . information on it." This document, admitted at trial, purports to be a form from the Juvenile Court of Davidson County. It indicates May 9, 2005 as the date of the crime, and bears the purported signatures of Shirley Hall, Deputy Clerk Notary, and Leon Ruben, Judge. The document also indicates that the Defendant swore the application out on May 30, 2007. The crime is described as "State property was used by [the victim] to go on the internet to view several porn websites."[5] Also found was a letter dated January 5, 2007, addressed to the victim stating, in part,

[t]his tape consist[s] of some love messages you left for me on either my home, work or cell phone. It seems that you will never tell your mother the truth so since I'm the bad guy listen to them closely. I know you don't want your mother or friends to hear them. I have 6 more copies but the one for your mother have all of them and then some, they are all ready to be mailed unless you give me a call.

---

[5] The victim testified that he never saw the warrant, however.

Also found in the Defendant's home were various items of sexual paraphernalia.

Det. Doersam testified that he asked the Defendant about the "tapes" but stated that the Defendant never produced such a tape to him. On cross-examination, Det. Doersam acknowledged that they did not have emails from 2004, 2005, or 2006, the period of time referred to in the indictment.

The victim also provided Det. Doersam with voice mail messages that the Defendant left on his phone in 2007. These messages were played for the jury over the defense's objection. This Court has listened to these messages but found them largely unintelligible. Although the record indicates that a transcript was made of these messages and provided to the jury, the record before us does not contain such a transcript.

In addition to the Defendant's statement and voice mail messages, the trial court admitted numerous documents that the Defendant had admitted authoring. As set forth in more detail below, the trial court ruled that these documents were admissible after conducting a Tennessee Rule of Evidence 404(b) hearing prior to trial. The majority of these documents consisted of e-mail correspondence between the Defendant and the victim that took place after the alleged offenses with which the Defendant was charged. This e-mail correspondence from the Defendant to the victim includes the following excerpts:[6]

> February 1, 2007: . . . I should be your main concern trying to make me happy to a point so that I will not mail the tapes. . . . [Y]ou have a decision to make by next Wednesday, you're either going to love me truthfully or else I'll send the tapes out that Thursday. I have nothing to lose . . . . Do you really realize who I'll be sending these tapes to, you'll never have a girlfriend R[], you'll be put out [of] your mother's house and into the BIG house (jail) you don't realize the effect these tapes will cause to you and others. . . . I can't and will not continue to go back and forth with you and how you feel, you're saying you love me, *we have sex*, you're kissing me and then you feel that we should just be friends and work our way up. . . . You have until next Wednesday to make a decision[.]

A letter attached to the February 1 e-mail included the following:

> Your mother knows I will not let it die and more embarrassment will be on you all instead of me and especially with these tapes. Not only will she put you out after hearing the tape you'll also go to jail. I haven't let anything go

---

[6] The correspondence also included additional messages not here excerpted.

-12-

everything is still in place. I am hating your black ass every second, minute and hour of the day, I've never hated anyone like this before that's why I need to get rid of all this hate. I know it's wrong to even hate someone so that's why this proposal is being made to you. You need to love me as you have said in the pas[t] to make me feel that way again so that I can get rid of this hate and once I do I'll give up the tapes and then walk away from it all but I can't with all this hatred inside of me. I know you can do it because you do whatever you want when and how you want to do it and I know that there's some fire still down inside of you that really loves me. As I said once I feel the love for you again I'll walk away from it all. *That Tuesday when we had sex* I was trying to see if I could feel something then but to know [sic] avail. I walked away sore for four days because I told you it had been a long time and that it would hurt. *When I feel your hard dick* I want to feel the sensation of really wanting to be with you that burning desire and *when you are up inside of me* I want to feel that you are search[ing] to hit that spot as you have before but now all I can fe[e]l is hatred for you. . . . Let me say this your black ass is living on a time bomb and I don't give a damn about you R[] in the pas[t] yes but now it's really different and you need to understand that, I'm not playing around. . . . Not only am I going to send the tape to your mother but a copy to DCS as well now you know what that will do for your mother's household. So you'll be put out and going to jail and your mother will be investigated with those two children because I have a nice letter to go in with the tape. . . . R[], there's not going to be a girlfriend at all in your life if this is not solved. I will send a copy of these tapes to every girl I think you're interested in or that might be interested in you. . . . I use[d] to just sizzle with smiles when I think of the time I was taking you to Jack in the box when your dick was stiff and hard and then *we went to the house and had sex*, the time when your mother went to the Tom Joyner show early in the morning *when you bucked me on the big chair and made the both of us cum at the same time* you were ever so gentle, *the time when you had me sitting on your lap and when you finally hit that spot you had we* [sic] *screaming. . . .the time when we made love* and afterwards you held me in your arms and we sleep through the night, *the time when you bucked me in my living room in the wing back chair, the time at the hotel when you began to undress me and you were able to get two that night within an hour and the times when you would get two or three when we would go to my house for an hour before time for you to go to the church.* . . . R[], you're the only one that can make this change so its best you contact me tonight or your life will become a living hell beginning on Monday there will be three tapes that will go out on Monday and I'm sure you can guess which ones they are now your mother will have to sign for hers at work or whoever is at the reception area.

March 21, 2007: . . . You lied to me about your break on Sunday which isn't the first time you lied about you[r] break. . . . I had Attorney Burt to call your manager about your break on Sunday and why you lie so I just don't know. You know you can lose your job but you w[o]n[']t have to worry about that long. . . . I can't continue trying to stop what should have been done at first and that is send your ass to jail and mail those tapes. . . . I hope you realize that you lying to me wasn't hurting me at all it was only putting yourself in danger of being put out and going to jail. . . . Oh by the way I'm up here this morning to meet with Attorney Burt at 7:30 so its' almost that time. BYE.

April 3, 2007: . . . If you really wanted to take me to the hotel that is what would have happen, your interest has to be in taking me to the hotel also but not thinking about [your prom date] when we're together. Your interest is really not in me it's about making sure that those tapes aren't mailed and you going to jail. . . . Now we had better be together at the hotel Wednesday and Saturday making hot passionate love or you will not have to worry about the prom at all.

April 5, 2007: . . . I must say that I am some what happy today after *last night. You really put it on me in a good way it was amazing how you were able to hit it to the left and right with me riding you. Even though I had to take it out a couple of times due to the hurting but you put it back in.* Now that was making love and not just having sex. . . . I was thinking about how we would go to the house before taking you to the learning center and I would push you against the wall and start taking off your clothes now *those were some good days. You were good at making us both cum when you're on top and playing in my ear with your tongue.*

May 21, 2007: . . . [Y]our time is running out. . . . I've said to you I will not be played, taken advantage of, will not put up with this as long as I have in the pas[t] and I will not lose this time around. I am holding to that and once the time table has come and you have not made things happen then I will walk and things will beg[i]n to happen, the tape to your mother and Attorney Burt's action.

May 30, 2007: . . . I am moving on with my life without you in it. I deserve some true happiness in my life without not [sic] a bunch of games of lies and deceit. I can truly say that I tried and did put my best foot forward with you and did all that I could for and with you. Now I must move on because I can't continue to try and protect you any longer you must pay for the crime you committed. . . . I'm going downtown this morning to put the next

step of my plan into action. You haven't taken me serious at all in any of this but I can have the item mailed to your work address . . . .

June 17, 2007: . . . I don't care if we don't see each other again before July 2 all I know is if those 3 conditions are not me[]t I'll see you in court. . . . You don't think I'm going to go through with it but I can show you better than I can tell you especially after all you've done to me and how you've treated me. I mean nothing to you except just a get over. We'll see in the end.

June 18, 2007: . . . What I want to feel is that I'M IN LOVE WITH YOU AND YOU'RE IN LOVE WITH ME that's all I want. I want to be happy like I was last Wednesday and you said it can happen.

June 20, 2007: . . . You show me everyday when we're apart that I'm not important in your life when with the situation at hand of you going to jail. . . . I've accepted the fact that you got me into this and I deal with it but throughout all this time we're only together for an hour 2, 3 and sometimes 4 times out of the week but can never be together outside and then how you lie and deceive me but want me to continue to be that good old crazy man and dismiss the application for warrant.

July 17, 2007: . . . Now I did call you yesterday but no more after I left work so now I take it you have told your mother that I've been calling you and God knows what else. I know you haven't told her the truth and it's a good thing I did save that message you left yesterday morning and now I can add it to the tape I have since you have destroyed yours. You talking all about religion and godly things what you did yesterday was not godly and at your mother's house, your lying is not godly so it's about whatever will benefit you but trust me it's all going to catch up with you and remember you'll be t[ur]ning 18 in October you'll be an adult.

(Emphases added). In addition to these (and other) e-mails, the admitted documents include a handwritten letter dated July 17, 2007, that the Defendant acknowledged having written and sent to the victim's mother. It is signed with a female name and requests T. D. to "have [the victim] stop calling me" and accuses the victim of calling her "ugly names" and asking her to come to his house for sex. Also admitted was a typewritten letter dated July 18, 2007, addressed to the victim's mother and from "Concern Neighbors." This letter claims that the authoring wife and her husband were walking in the neighborhood and saw the victim and his girlfriend "caring [sic] on in the front window ceil [sic] of your home." The author expressed concern that "that type of caring [sic] on should be in the privacy of ones home

-15-

and not in public view." The Defendant admitted that he wrote this letter in an attempt to get the victim in trouble.

Detective Carrigan also testified at the trial as the State's final witness. He clarified that it was not a crime to look at pornography on a state computer.

After the State rested, the trial court denied the defense motion for judgment of acquittal. The State then made to the jury the following election of offenses as to the counts in the indictment that alleged sex offenses:[7]

> Count 1, rape, lack of consent, refers to the proof that the defendant penetrated his own anus with the victim['s] penis on a date in the late summer, early fall of 2004 at the defendant's home on Longleaf Court in Davidson County. This count represents the first incident of sexual abuse recalled by the victim.

> Count 2, rape, lack of consent, refers to the proof that the defendant penetrated his own anus with the victim's penis on the date in the late summer, early fall in 2004 at the defendant's home on Longleaf Court in Davidson County. This count represents the second incident of sexual abuse recalled by the victim.

> Counts 3 and 13. Rape by force of [sic] coercion and rape by fraud, alternative theor[ie]s. Both counts reflecting the proof that the victim penetrated the defendant's anus with his penis on a date after the . . . May 2005 porn incident at the defendant's home in Longleaf Court in Davidson County. These counts refer to the first incident of sexual penetration after the defendant caught the victim viewing pornography.

> Counts 4 and 14, rape by force or coercion, and rape by fraud, alternative theories. Both counts reflecting the proof that the victim penetrated the defendant's anus with his penis on a date after the May 2005 porn incident at the defendant's home on Longleaf Court in Davidson County. These counts refer to an incident of anal penetration after the defendant performed oral sex to cause the victim to have an erection.

> Counts 5 and 15, rape by force or coercion, and rape by fraud, alternative theories. Both counts reflecting the proof that the victim penetrated

---

[7] Because there was only one count of forgery, and because the count referred specifically to the purported letter from Dr. Pinnock, the State was not required to make an election as to this offense.

the defendant's anus with his penis on a date after the May 2005 porn incident at the defendant's home on Longleaf Court in Davidson County. These counts refer to the first incident of sexual contact occurring on a Wednesday before church during the victim's Sophomore year.

Counts 6 and 16, rape by force or coercion and rape by fraud, alternative theories. Both counts reflecting the proof that the victim penetrated the defendant's anus with his penis on a date after the May 2005 porn incident. This count refers to an incident of sexual contact occurring under a bridge near the victim's home.

Counts 7 and 17, rape by force or coercion, and rape by fraud, alternative theories. Both counts reflecting the proof that the victim penetrated the victim's anus with his penis on a date after the May 2005 porn incident at the defendant's home on Longleaf Court in Davidson County. These counts refer to an incident of sexual contact during the summer prior [to] the victim's junior year in high school.

Counts 8 an[d] 18, rape by force or coercion and rape by fraud, alternative theories. Both counts reflecting the proof that the defendant performed oral penetration on the victim[']s penis on a date after the May 2005 porn incident at the defendant's home on Longleaf Court in Davidson County. These count[s] refer to the first incident of the defendant performing oral sex on the victim prior to their engaging in anal sex.

Counts 9 and 19, rape by force or coercion and rape by fraud, alternative theories. Both counts reflecting the proof that the defendant performed oral penetration on the victim's penis on a date after the May 2005 porn incident at the defendant's home on Longleaf Court in Davidson County. These counts refer to the last incident of the defendant performing oral sex on the victim.

Counts 10, 20 and 24 rape by force or coercion, rape by fraud, and aggravated statutory rape, alternative theories. All counts reflecting the proof that the victim penetrated the defendant's anus with his penis on a date in the late summer or early fall of 2006 prior to the victim becoming employed at Academy Sports at the defendant's – at the defendant's home on Longleaf Court in Davidson County. These counts refer to the first incident of sexual contact after the victim received the forged letter from Dr. P[i]nnock.

Counts 11, 21 and 25, rape by force or coercion, rape by fraud, and aggravated statutory rape, alternative theories. All counts reflecting the proof that the victim penetrated the defendant's anus with his penis on a date in the late summer, early fall, 2006 prior to the victim becoming employed at Academy Sports at the defendant's home on Longleaf Court in Davidson County. These counts refer to an incident of sexual contact that occurred a short time prior to the victim's 16th birthday. This is the last time they had sex at this location.

Counts 12, 22 and 26, rape by force or coercion, rape by fraud, and aggravated statutory rape, alternative theories. All counts reflecting the proof that the victim penetrated the defendant's anus with his penis on a date in early fall of 2006 in the unisex bathroom at Academy Sports[.][8]

The defense put on no proof.

After deliberating, the jury convicted the Defendant of all counts as charged. After a hearing, the trial court sentenced the Defendant as a standard offender to eight years each on Counts 1 and 2 (both counts charging rape); eleven years each on Counts 13 through 22 (all counts charging rape); two years on Count 23 (charging forgery); and four years each on Counts 24 through 26 (all counts charging aggravated statutory rape). The trial court then merged Counts 3 through 12 (which charged rape by force or coercion) with Counts 13 through 22 (which charged rape by fraud), respectively; Count 24 (which charged aggravated statutory rape) with Counts 10 (rape by force or coercion) and 20 (rape by fraud); Count 25 (aggravated statutory rape) with Counts 11 (rape by force or coercion) and 21 (rape by fraud); and Count 26 (aggravated statutory rape) with Counts 12 (rape by force or coercion) and 22 (rape by fraud).[9] The trial court ordered some of the sentences to be served consecutively, resulting in an effective sentence of thirty-five years.

On appeal, the Defendant challenges (1) the trial court's 404(b) ruling; (2) the election of offenses submitted by the prosecution (including a claim of double jeopardy); (3) the sufficiency of the evidence; and (4) his sentence.

_____

[8] This is the election of offenses delivered verbally by the prosecutor to the jury as reflected in the transcript of evidence. Although the trial court told the jury that the jury charge would also include the State's election of offenses, the record on appeal does not contain either a transcript or a copy of the jury instructions.

[9] Because the judgment orders do not reflect the mergers, this matter is remanded to the trial court for correction of the judgment orders to accurately reflect the ordered mergers.

**Analysis**

*404(b) Ruling*

The Hearing

Prior to trial, the State filed a notice of its intent to elicit testimony at trial of "other instances of sexual conduct" between the Defendant and the victim that occurred after the indicted offenses and in a different county. The State asserted that this evidence would be relevant to (1) establish the nature of the relationship between the Defendant and the victim; (2) place certain other evidence into context; (3) "establish the [D]efendant's opportunity, motive, intent, and scheme or plan to sexually abuse" the victim; and (4) that it would complete the factual background so as to "avoid a contextual or chronological void." The evidence for which the State was seeking a ruling of admissibility included e-mails between the Defendant and the victim, letters written by the Defendant but purporting to be from other authors, and an application for arrest warrant from juvenile court. The Defendant's statement to the police was not proffered by the State in this context.

The trial court held a hearing, and Detective Carrigan testified. Det. Carrigan explained that they had been investigating a sexual relationship between the Defendant and the victim that spanned approximately three years and that began in Davidson County and then moved to Sumner County. Det. Carrigan described the sex acts occurring in both counties as "the same types of sex acts." Det. Carrigan acknowledged that, by the time they became aware of the alleged offenses, the Defendant and the victim were no longer having sex in Davidson County. Det. Carrigan also acknowledged that the e-mails and other documents that he had been provided had been created after the alleged sex acts had moved to Sumner County. According to Det. Carrigan, however, "some of those e-mails and other stuff made reference to issues that had occurred in Davidson County."

Det. Carrigan testified that the Defendant acknowledged his authorship of the collected documents during the interview and also "acknowledged having made comments in those e-mails and other items for the purpose of intimidating and coercing the victim into an ongoing sexual relationship."

Arguing for the admission of the e-mails and other documents, the prosecutor explained,

> The physical evidence collected is dated outside the time frame specifically of
> our indictment, and it's dated within the time frame of the acts that occurred
> in Sumner County. However it's very much of a similar nature and

corroborates what the child will be testifying to with regard to how [the Defendant] manipulated and coerced [the victim] here in Davidson County.

The prosecutor also claimed that, because the victim did not come forward until after the relationship had moved to Sumner County, "it would leave a conceptual void for the jury to think that it just stopped here in Davidson County and then some months later the child disclosed."

The defense objected to the admissibility of the documents to the extent they concerned "any activity in Sumner County." Defense counsel argued that the State was seeking to use this evidence "to show that [the Defendant] did this so you know he did that" and to "have a pile-on effect," all in direct contravention of Tennessee Rule of Evidence 404(b).

The trial court ruled as follows:

I do find that by clear and convincing proof these e-mails, the evidence that has been introduced here occurred, the statements made by [the Defendant] in terms of acknowledging sexual acts in Davidson County and Sumner County occurred. I do think obviously there are material issues other than just piling on . . . more than just trying to or at all trying to introduce propensity evidence. I mean, it's the same type allegations, the same type conduct that's involved here in these allegations of the indictment here in Davidson County. The question is should the jury hear that at any point after September 30th, 2006, did anything occur between [the Defendant] and the alleged victim in terms of other sexual acts, other communications, other interplay at all in terms of conduct between them. Obviously it did. So I don't think the State is prohibited from ending any inquiry with the alleged victim or the detectives at 9-30-06 because there obviously are material issues. Is this a violation of the law? Was there an intentional knowing rape of the alleged victim or an aggravated statutory rape? Those letters, e-mails that I've read could if the jury believes them – and, again, there's been no contradictory evidence here offered today for me to consider – but if they believed that those came from [the Defendant] to the alleged victim and back and forth, it in the Court's opinion would explain quite a bit possibly as to why the alleged victim didn't do something sooner or what were these threats about. It explains all of that to much of a degree. So you have proof of motive of him to prevent the alleged victim from disclosing intent. [sic] That would show, you know, why would he do or say those things in the e-mails, [the Defendant], if he weren't concerned about the alleged victim reporting any incidents from Davidson County. It explains all that if believed. Is it prejudicial? Sure. I wouldn't

want the jury seeing some of those things in those e-mails if I was on trial. I understand that. But they're extremely probative for those reasons I've just explained; motive, intent, explaining the ongoing relationship between the defendant and the alleged victim. It has in the Court's opinion admissions that can be argued or viewed as relevant to the charges on trial for Davidson County. It corroborates things that the State is alleging in the indictment and mentions specifically an ongoing two and a half year sexual relationship. So it's extremely probative, and that probative value in the Court's opinion is not outweighed by the danger of not prejudice but unfair prejudice.

In sum, the trial court ruled admissible two letters written by the Defendant but purporting to be from someone else; fifteen pieces of e-mail, some including multiple messages, from the Defendant to the victim (and some of these including messages from the victim to the Defendant); and an application for an arrest warrant in juvenile court prepared by the Defendant. All of these items were created after the periods of time referenced in the indictment.

On appeal, the Defendant argues that the trial court committed reversible error in admitting this proof because it referred to conduct that was not on trial; it "shed no light on any offenses alleged to have occurred during the indicted period"; and the admitted e-mails and documents "could not be used to force, coerce, or [de]fraud [the victim] into engaging in sexual activity prior to the[ir] construction."

## Analysis

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). "Other purposes" include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (appx) (Tenn. 2004); see also State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000) (holding that "contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an 'other purpose' under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case"); State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992).

Even where the evidence is offered for "other purposes," however, several conditions must be satisfied for its admission:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Where the trial court substantially complies with this procedure, we will not overturn its decision to admit the evidence absent an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). In this case, the trial court substantially complied with Rule 404(b)'s procedure and ruled that "motive, intent, and to explain the ongoing relationship between the Defendant and the victim" were the purposes for which the evidence of his subsequent conduct was admissible.

Initially, we address the State's argument that this evidence of other crimes, wrongs, or acts was "apparently admitted" pursuant to the hearsay exception for admissions by a party opponent. See Tenn. R. Evid. 803(1.2). The State asserts in its brief that "[i]t is questionable whether Rule 404(b) may be invoked to exclude a defendant's statements," and alleges that it "has been unable to locate a case that says it can." To the contrary, this Court has stated clearly and unequivocally that "[t]he fact that the prior bad acts evidence is contained within a defendant's statement to the police concerning the offense at trial does not relieve the trial court of the duty to conduct a Rule 404(b) hearing to determine the admissibility of the admissions." State v. Michael Bailey, No. W2005-01815-CCA-R3-CD, 2007 WL 763212, at *3 (Tenn. Crim. App. Mar. 13, 2007); State v. Debra Elaine Kirk, No. E2004-01263-CCA-R3-CD, 2005 WL 2402921, at *11 (Tenn. Crim. App. Sept. 30, 2005) (same). See also, e.g., State v. Thacker, 164 S.W.3d 208, 239 (appx) (Tenn. 2005) (noting that, "while [other bad acts] evidence usually does not come in the form of statements or confessions made by the defendant, there exists no valid reason to make an exception to the requirements [of Rule 404(b)] for prior bad act evidence disclosed in a defendant's confession"); State v. Cyntoia Denise Brown, No. M2007-00427-CCA-R3-CD, 2009 WL 1038275, at *24 (Tenn. Crim. App. Apr. 20, 2009) (reviewing admissibility of the defendant's statements under Rule 404(b)). And, we point out that the text of the relevant hearsay exception provides that admissions "are not excluded *by the hearsay rule*." Tenn. R. Evid. 803 (emphasis added). Admissions *are* subject to being excluded by other rules of evidence. State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007) (recognizing that a defendant's statements are admissible pursuant to Rule 803(1.2) but are "subject to exclusion . . . by other rules of evidence"). For

instance, if an admission is irrelevant, it is subject to being excluded pursuant to Tennessee Rule of Evidence 402. Rule 404(b) may also require the exclusion of a defendant's admission.

Furthermore, as set forth above, the trial court in this case conducted a 404(b) hearing and admitted the e-mails etc. pursuant to that Rule. Because the trial court complied substantially with the procedural requirements of 404(b), we may reverse its decision only upon finding that the trial court abused its discretion in ruling the evidence admissible. See Dubose, 953 S.W.2d at 652.

Turning to our review of the trial court's ruling, it is helpful to distinguish between the "crimes, wrongs, or acts" to which the admitted evidence refers. The e-mails from the Defendant to the victim established two distinct types of "other crimes, wrongs, or acts": (1) the Defendant's 2007 threats to the victim; and (2) sexual acts between the Defendant and the victim other than those charged.[10] We agree with the trial court that the evidence of the Defendant's threats to the victim was not offered to establish the Defendant's character and action in conformity therewith. Rather, the proof of the Defendant's 2007 threats to the victim was offered to demonstrate the Defendant's underlying motives and intentions with regard to his relationship with the victim. It also was offered to establish how the Defendant had been able to conduct a sexual relationship with a teenaged victim who was otherwise in a position to avoid or defend himself against the Defendant's advances. Proof of the Defendant's threats delivered after the charged offenses was also relevant to explaining the significant gap in time between the date of the last charged offense and the date on which the victim finally reported the Defendant's crimes to the police.

The more troubling aspect of this evidence is its numerous references to sexual penetration between the Defendant and the victim that occurred outside the time frame charged in the indictment. As this Court has previously observed, one danger of admitting evidence of uncharged acts is that a jury will convict of charged behavior on the basis that, if the defendant engaged in similar conduct at a different time, he must have committed the crimes on trial. See, e.g., State v. Gilley, 297 S.W.3d 739, 757 (Tenn. Crim. App. 2008); State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995); see also State v. James, 81 S.W.3d 751, 762 (Tenn. 2002) (recognizing that "[t]here can be little doubt that a trier of fact will view an individual with a substantial criminal history as more likely to have committed a crime than an individual with little or no past criminal history"). Indeed, our Supreme Court explicitly has recognized that

---

[10] The letters and application for arrest warrant were also evidence of threatening behavior that the Defendant engaged in after the indicted offenses.

-23-

The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial. Such a potential particularly exists when the conduct or acts are similar to the crimes on trial.

State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citation omitted). See also Spicer v. State, 12 S.W.3d 438, 448 (Tenn. 2000) (recognizing that "a real probability exists that the jury could be overwhelmed by the sheer volume of prejudicial evidence and that the jury could be tempted to convict based upon a defendant's propensity to commit crimes rather than convict solely upon evidence relating to the charged offense").

A second danger is "that the admission of other-acts evidence poses a substantial risk that a trier of fact may convict the accused for crimes other than those charged." State v. James, 81 S.W.3d 751, 758 (Tenn. 2002). And, as our Supreme Court has recently emphasized, "[a]lthough 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged – or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment – creates a prejudicial effect that outweighs ordinary relevance." State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008) (quoting Old Chief v. United States, 519 U.S. 172, 181 (1997)).

In this case, however, the vast majority of the Defendant's messages to the victim concern his feelings about the victim and his attempts to manipulate the victim into continuing their sexual relationship. These writings assisted the jury to understand why the victim – a teenager rather than a young child, and who did not live with his abuser – did not take measures to stop or avoid the abuse. They also assisted the jury to understand that the victim did not sit idly by for many months after the charged offenses stopped before turning to authorities, but that the victim was still under the Defendant's influence until mere days before he reported the offenses.

Moreover, even if the trial court abused its discretion in admitting the e-mail documents (or portions thereof) that referred to uncharged sexual acts, the Defendant is not entitled to relief if the error is harmless. See Rodriguez, 254 S.W.3d at 371-72. It is the Defendant's burden to demonstrate that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); see Rodriguez, 254 S.W.3d at 372. In determining the effect of a 404(b) evidentiary error, we consider the entire record on appeal, and "[t]he greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Rodriguez, 254

S.W.3d at 372. Further,

> When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless.

Id. (citations omitted).

In this case, the jury heard not only the victim's testimony about the charged acts of sexual penetration between him and the Defendant, but also had before it the Defendant's lengthy statement to law enforcement in which he confessed to repeated sex acts with the victim over the period of time charged in the indictment.[11] The evidence against the Defendant simply was overwhelming without regard to the Defendant's e-mail messages to the victim. We are confident that the evidence admitted pursuant to Rule 404(b) had, in the final analysis, little impact on the jury's decision-making. Therefore, we hold that any error by the trial court with respect to the admissibility of the contested documents was harmless and entitles the Defendant to no relief.

---

[11] As to those portions of the Defendant's statement that referred to unindicted sex acts, the trial court delivered the following contemporaneous instruction to the jury:

> [I]f from this . . . statement, you find that the defendant has committed any alleged crime or crimes other than that for which he is on trial here in this jurisdiction or any mention about any other jurisdiction, you may not consider that evidence to prove his disposition that he committed the alleged crimes that he's on trial for. This evidence, if you consider it at all, may only be considered by you for the limited purpose of determining whether it provides motive. That is, such evidence may be considered by you if it is evidence to show a motive for the defendant for the commission of the offense[s] presently charged, or of defendant's intent. That is, such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime for which he is presently charged or to explain the ongoing or past relationship between the defendant and the alleged crime [sic] during the periods of time that you have heard about during the course of this trial.

> So that evidence mentioning other alleged events, if considered by you for any purpose, must not be considered for any purpose other than what I've specifically stated here.

The Defendant also raises challenges to the State's election of offenses. First, the Defendant complains that the State's election "significantly and effectively alter[ed] the indictment as to time, place, and act." The Defendant grounds this argument on a comparison between the indictment and the State's alleged response to the Defendant's motion for bill of particulars. The record on appeal, however, does not contain the State's response. Although the Defendant attached to his brief a copy of a document titled "State's Response to Request for Bill of Particulars," attachments to a brief are not part of the appellate record. See Tenn. R. App. P. 24(a); Willis v. Tenn. Dep't of Corr., 113 S.W.3d 706, 709 n.2 (Tenn. 2003); State v. Price, 46 S.W.3d 785, 812 (Tenn. Crim. App. 2000).

Tennessee Rule of Appellate Procedure 24 provides that it is the appellant's duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). When the record does not contain the information necessary for our review, we presume that the trial court's ruling on the issue is correct. See State v. Griffis, 964 S.W.2d 577, 592-93 (Tenn. Crim. App. 1997). We, nevertheless, have compared the State's election of offenses with the indictment, both of which are in the record on appeal, and discern no significant alteration as to time, place, or act. While we note that the State's election did not refer to specific dates other than the Computer Incident, and, perhaps, could be problematic, the Defendant has failed to demonstrate that he was thereby prejudiced because the record contains neither the closing arguments nor the trial court's charge to the jury, either of which may have clarified this omission. The Defendant is not entitled to relief on this issue.

Second, the Defendant asserts that

> [t]he Election of Offenses served to expose the Defendant to being tried and/or sentenced twice for the same offenses listed within the Election, as well as expose him to risk of being tried in another County for the same offenses alleged in this cause. The counts lack particularity and specificity and appear to be patched together.

This assertion attempts to raise two issues: election of offenses and double jeopardy. The Defendant has waived these issues by failing to cite to any legal authority whatsoever. Tenn. Ct. Crim. App. R. 10(b); see also State v. Watson, 227 S.W.3d 622, 648 (Tenn. Crim. App. 2006); State v. McCary, 119 S.W.3d 226, 242-3 (Tenn. Crim. App. 2003); State v. Chance, 778 S.W.2d 457, 462 (Tenn. Crim. App. 1989). We also fail to understand how the State's election of offenses regarding crimes committed in Davidson County could expose the

Defendant to prosecution in another county for the same crimes. Pursuant to article I, section 9 of the Tennessee Constitution, an accused must be tried in the county in which the crime was committed. See State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006); see also Tenn. R. Crim. P. 18(a). The Defendant has not demonstrated that he is entitled to relief on these issues.

Finally, the Defendant contends that "the Prosecutor erred in making the oral and anal penetration two separate counts, even though the testimony adduced at trial shows that the oral sex was used simply to help facilitate [the victim] getting an erection." Again, the Defendant has failed to cite to any legal authority. See Tenn. Ct. Crim. App. R. 10(b). Moreover, our Supreme Court has made clear that different types of sexual penetration, even if committed during a single episode between perpetrator and victim, are separate offenses for double jeopardy purposes. See State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996). The Defendant is entitled to no relief on this issue.

*Sufficiency of the Evidence*

The Defendant contends that the evidence is not sufficient to sustain Counts 1 and 3 through 26 of the indictment. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in Count 1, the Defendant was convicted of rape consisting of the "unlawful sexual penetration . . . of the defendant by a victim" where the penetration "is accomplished without the consent of the victim and the defendant knows or has reason to

know at the time of the penetration that the victim did not consent." Tenn. Code Ann. § 39-13-503(a)(2) (2003). Sexual penetration is statutorily defined as including anal intercourse. Id. § 39-13-501(7) (2003). At trial, the victim testified that his first episode of sexual contact with the Defendant began while he was asleep. He awoke in the Defendant's spare bedroom to find the Defendant on top of him, facing away, and "grinding back and forth" while the victim's "privates were out" and "[i]n [the Defendant's] anal region." The victim described the contact as "[s]kin to skin." The Defendant argues to this Court that the victim's testimony does not establish sexual penetration. However, when asked by the police about his initial sexual encounter with the victim, the Defendant described their contact as "his penis *in me*." (Emphasis added). He also admitted to Det. Carrigan that his initial sexual contact with the victim included anal intercourse. Together, this proof is sufficient to establish sexual penetration. The victim's testimony that he was asleep when the Defendant began his sexual assault satisfies the element that the Defendant had reason to know that the victim did not consent. In sum, the proof is sufficient to establish the crime of rape. Therefore, we affirm the Defendant's conviction of rape as charged in Count 1 of the indictment.

The Defendant does not contest the sufficiency of the evidence supporting his conviction of rape accomplished without the victim's consent as charged in Count 2 of the indictment, which referred to the second episode of anal sex between the Defendant and the victim. The victim's testimony was specific as to this incident and is sufficient to support the conviction. We therefore affirm the Defendant's conviction of rape as charged in Count 2 of the indictment.

As to his convictions for rape by force or coercion and rape by fraud, the Defendant argues that "[t]here was no proof that the Defendant used force, coercion, or fraud to unlawfully sexually penetrate [the victim] in Davidson County, Tennessee." As to Counts 6 and 16, the Defendant also contends that the State failed to prove venue. The Defendant makes no particular argument as to the sufficiency of the evidence supporting his remaining convictions.

In the crime of rape by force or coercion, coercion is statutorily defined as the "threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Tenn. Code Ann. § 39-13-501(1) (Supp. 2005, 2006). This Court has held that this definition is satisfied when a defendant threatens to expose a victim's activities that could result in criminal prosecution. See State v. McKnight, 900 S.W.2d 36, 50 (Tenn. Crim. App. 1994). In this case, the victim testified that, after the Computer Incident, the Defendant told him that he "could go to jail no less than seven years" for looking at pornography on a state computer. The victim thereafter resumed his sexual relationship with the Defendant the following school year, explaining that they had sex every Wednesday after school. The proof

-28-

established that the Defendant threatened the victim with the Computer Incident repeatedly during the course of the sexual relationship. According to the victim, he understood the Defendant as making these statements in order to have the victim cooperate with their sexual relationship. The Defendant continued to threaten him every time the victim tried to end their sexual relationship. We hold that these threats satisfy the definition of "coercion" as used in the rape statute. Moreover, at the time the victim began working at Academy Sports, the Defendant had threatened to expose the victim's homosexual activities with him. This formed an additional factual basis for a finding of coercion as to the offenses committed during that time frame. See McKnight, 900 S.W.2d at 50; State v. Steven Craig Fults, No. M2004-02092-CCA-R3-CD, 2006 WL 1896356, at *12 (Tenn. Crim. App. 2006).

Rape by fraud is committed when the accused accomplishes sexual penetration with the victim by fraud. Tenn. Code Ann. § 39-13-503(a)(4) (Supp. 2005, 2006). Fraud is defined for purposes of our criminal code as follows: "'Fraud' means as used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title." Id. § 39-11-106(a)(13) (2006). This Court has held that a person commits rape by fraud

> when he or she engages in sexual penetration that is accomplished by fraud. The fraudulent conduct could have included trickery, subterfuge, or some other misrepresentation by the [accused] that gave the victim[] a false impression and allowed or aided [the accused] in the accomplishment of the sexual penetration.

State v. Raymond Mitchell, No. M1996-00008-CCA-R3-CD, 1999 WL 559930, at *6 (Tenn. Crim. App. July 30, 1999). This Court also has recognized that "[t]he fraud may go directly to the sexual penetration itself, or may relate to the inducement of the sexual act." Id. (citing Tenn. Code Ann. § 39-11-106(a)(9)(A) (1991); State v. Tizard, 897 S.W.2d 732, 741-42 (Tenn. Crim. App. 1994)). This Court recently affirmed convictions of rape by fraud where the defendant told the fourteen-year-old victim "that she needed to have sex with him to grant him sufficient [magical] power to heal her mother and [sister] after they had surgery [and that] otherwise they would be crippled or die" and also promised that he could give the victim "magic powers through sex." State v. Marcos Enrique, Sr., No. M2009-02319-CCA-R3-CD, 2011 WL 4529643, at *16 (Tenn. Crim. App. Sept. 29, 2011).

In this case, the Defendant repeatedly threatened the victim with prosecution and jail because of the Computer Incident. As set forth above, the victim testified that the Defendant told him that he "could go to jail no less than seven years" for the Computer Incident. Det. Carrigan testified that there is no criminal offense for viewing pornography on a state computer. We have confirmed that, based upon state law, the victim – who was a minor at

the time – was not at risk of being imprisoned for seven years or more because he looked at pornography on the Defendant's work computer. Accordingly, we hold that the Defendant's threatening the victim with jail for the Computer Incident was fraudulent.

Aggravated statutory rape is defined as "the unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim." Tenn. Code Ann. § 39-12-506(c) (2006). In this case, the proof established that the victim was sixteen years old at the time of the aggravated statutory rapes and the Defendant was in his forties.

Turning to the Defendant's specific convictions, the jury convicted the Defendant of rape by force or coercion on Count 3 and of rape by fraud on Count 13. According to the State's election, both of these Counts referred to the first instance of the victim penetrating the Defendant's anus with his penis at the Defendant's home after the Computer Incident. The victim testified that, after the Computer Incident, he resumed having sex with the Defendant. The victim described these encounters as occurring on Wednesdays during his sophomore year and taking place at the Defendant's residence. The Defendant's statement provided similar details. Additionally, this episode was alleged to have occurred after the Computer Incident, upon which the Defendant's threats were based. The Defendant's threats to have the victim jailed constituted coercion and were also fraudulent because the alleged basis for the threat – the victim's accessing pornography on the Defendant's computer – was not a felony offense. We therefore hold that the proof is sufficient to support the Defendant's convictions of Count 3 and 13.

The jury also convicted the Defendant of rape by force or coercion on Count 4 and of rape by fraud on Count 14. Both of these Counts referred to, according to the State's election, the victim penetrating the Defendant's anus with his penis after the Computer Incident, occurring at the Defendant's home, and "after the [D]efendant performed oral sex to cause the victim to have an erection." In addition to the proof set forth above, the proof in support of this offense consisted of the victim's testimony that the Defendant performed oral sex on him between five and ten times, and the Defendant's admission in his statement that he performed oral sex twice on the victim while they were at the Defendant's house. Therefore, the proof is sufficient to support each of these convictions.

We are constrained to point out that the State's election as to Counts 4 and 14, insofar as the incomplete record before us reflects, was ineffective to narrow the jury's consideration to a single incident of anal sex because the proof established up to ten incidents of preliminary oral sex. As our Supreme Court has made clear, "when the evidence indicates [that] the defendant has committed multiple offenses against a victim, the prosecution must

-30-

elect the *particular offense* as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) (emphasis added). This requirement is founded in part upon the Tennessee Constitution. State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001). Additionally, our Supreme Court has emphasized that

> there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution. A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offenses, instead of creating a "patchwork verdict" based on different offenses in evidence.

State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993) (quotation marks and citation omitted).

Because the victim testified that the Defendant performed oral sex on him between five and ten times, it is possible that the jurors could have been individually considering as many as ten different offenses for Counts 4 and 14. It is also possible, however, that the State eliminated this risk during its closing argument. This Court has recognized that a State may effectively elect its offenses via closing argument. See, e.g., State v. Warren Curnutt, No. M2006-00552-CCA-R3-CD, 2007 WL 1482390, at *6 (Tenn. Crim. App. May 22, 2007); State v. William Dearry, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App. Feb. 6, 1998). Because the Defendant has failed to include the closing arguments in the record on appeal, we presume that the trial court's actions were correct in this regard. See Griffis, 964 S.W.2d at 592-93.

Moreover, the record is inadequate to allow our review under the plain error doctrine. We may grant relief for plain error only where five prerequisites are satisfied: "(1) *the record clearly establishes what occurred in the trial court*, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice." State v. Jordan, 325 S.W.3d 1, 58 (Tenn. 2010) (quoting State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008)) (emphasis added). Additionally, "[i]t is the defendant's burden to convince this Court that plain error exists, and we need not consider all five factors 'when it is clear from the record that at least one of them cannot be satisfied.'" Id. (quoting State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). In this case, the record on appeal does not clearly establish what occurred in the trial court because the transcript of some of the relevant proceedings is not before us.[12] Accordingly, the first of the

---

[12] The record on appeal in this case was supplemented by the Defendant twice, the first time on May 3, 2011, and the second time on December 27, 2011 – after oral argument. In spite of these supplementations, the record remains incomplete.

five plain error prerequisites is not satisfied, and the Defendant therefore is not entitled to relief under plain error for any inadequacy in the State's election as to the offense for which it was seeking a conviction in Counts 4 and 14.

The jury also convicted the Defendant of rape by force or coercion on Count 5 and of rape by fraud on Count 15. According to the State's election of offenses, the State described this crime as "the victim penetrated the defendant's anus with his penis on a date after the [Computer] [I]ncident" at the Defendant's home, adding that the counts referred to "the first incident of sexual contact occurring on a Wednesday before church during the victim's Sophomore year." The proof in support of this offense consisted of the victim's testimony that he was at the Defendant's house "pretty much every Wednesday all of [his] sophomore year" and that he and the Defendant "would have sex every Wednesday at [the Defendant's] house." This episode was alleged to have occurred after the Computer Incident, and the Defendant's threats to have the victim jailed constituted coercion and were also fraudulent because the alleged basis for the threat – the victim's accessing pornography on the Defendant's computer – was not a felony offense. We hold that this proof is sufficient to support the Defendant's convictions of Counts 5 and 15. We recognize that this election appears to refer to the same incident elected for Counts 3 and 13 and that a single instance of rape cannot be elected to support multiple (independent) charges of rape because principles of double jeopardy prohibit the imposition of multiple punishments for a single offense. See State v. Watkins, __ S.W.3d __, __, 2012 WL 758912, at *7, 12 (Tenn. 2012). As with the election for Counts 4 and 14, however, the State may have cured this problem during its closing argument. For the same reasons set forth above, the Defendant is not entitled to relief for any inadequacy in the State's election as to the offense for which it was seeking a conviction on Counts 5 and 15.

The jury also convicted the Defendant of rape by force or coercion on Count 6 and of rape by fraud on Count 16. The Defendant claims that the State failed to prove venue as to these two counts. Both of these counts referred to, according to the State's election, "an incident of sexual contact [consisting of the victim penetrating the Defendant's anus with the victim's penis] occurring under a bridge near the victim's home" after the Computer Incident. The Defendant admitted to the police that the victim placed his penis in him while they were near a bridge near the victim's house. The letter purporting to be from Dr. Pinnock was addressed to the victim at his house on North Summerfield Drive in Madison, Tennessee. We take judicial notice that Madison, Tennessee, is located in Davidson County. Venue need be established by only a preponderance of the evidence. Tenn. Code Ann. § 39-11-201(e) (2006); Young, 196 S.W.3d at 101. We hold that the evidence is sufficient to establish venue as to these convictions. We also hold that the proof is sufficient to establish that the Defendant accomplished sexual penetration by coercion, as charged in Count 6, and by fraud, as charged in Count 16. This episode was alleged to have occurred after the

-32-

Computer Incident, and the Defendant's threats to have the victim jailed constituted coercion and were also fraudulent because the alleged basis for the threat – the victim's accessing pornography on the Defendant's computer – was not a felony offense. Therefore, we affirm the Defendant's convictions on Counts 6 and 16 of the indictment.

The jury also convicted the Defendant of rape by force or coercion on Count 7 and rape by fraud on Count 17. In its election of offenses, the State described this crime as the victim penetrating the Defendant's anus with his penis at the Defendant's home and which occurred "during the summer prior [to] the victim's junior year in high school." According to the victim, his sexual relationship with the Defendant continued into the summer following his sophomore year. This episode was alleged to have occurred after the Computer Incident, and the Defendant's threats to have the victim jailed constituted coercion and were also fraudulent because the alleged basis for the threat – the victim's accessing pornography on the Defendant's computer – was not a felony offense. We hold that the proof is therefore sufficient to support the Defendant's convictions of Count 7 and Count 17. For the reasons set forth above, we must presume that the trial court's ruling on the State's election of these offenses was correct.

The jury also convicted the Defendant of rape by force or coercion on Count 8 and rape by fraud on Count 18. The offense elected for these counts was "the first incident of the defendant performing oral sex on the victim prior to their engaging in anal sex." And, again, this offense was alleged to have occurred after the Computer Incident and at the Defendant's home. The Defendant admitted to having performed oral sex on the victim. The victim also testified that the Defendant performed oral sex on him. Sexual penetration sufficient to constitute rape includes fellatio. Tenn. Code Ann. §39-13-501(7) (Supp. 2005, 2006). For the same reasons set forth above, the proof is sufficient to establish that the Defendant performed fellatio on the victim at the time and place alleged. Also, for the same reasons set forth above, the proof is sufficient to establish that the Defendant committed the fellatio by coercion and fraud. Accordingly, we affirm the Defendant's convictions on Counts 8 and 18 of the indictment. We also hold that the State's election as to this offense was effective because it referred to the single "first" episode of oral sex.

The jury also convicted the Defendant of rape by force or coercion on Count 9 and rape by fraud on Count 19. According to the State's election of offenses, these counts referred to the "last incident" of the Defendant performing oral sex on the victim at the Defendant's home and after the Computer Incident. As set forth above, the victim testified about the Defendant performing oral sex on him and the Defendant admitted to doing same. We hold that the proof is sufficient to support these convictions. We also hold that the State's election as to this offense was effective because it referred to the single "last" episode of oral sex.

The jury also convicted the Defendant of rape by force or coercion on Count 10, rape by fraud on Count 20, and aggravated statutory rape on Count 24. The State's election of offenses described this incident as anal sex at the Defendant's home "on a date in the late summer or early fall of 2006 prior to the victim becoming employed at Academy Sports" and as "the first incident of sexual contact after the victim received the forged letter from Dr. P[i]nnock." The proof established that the victim was employed by Academy Sports shortly before he turned seventeen years old in October 2006. The letter purportedly from Dr. Pinnock was dated June 8, 2006. This description of the alleged crime therefore narrows the time frame to several weeks and specifies the incident further as the "first" after the victim got the forged letter. The victim testified generally that his Wednesday sexual encounters with the Defendant occurred during his sophomore year and the following summer. We hold that the proof is sufficient to support these convictions and that the State's election was adequate.

The jury also convicted the Defendant of rape by force or coercion on Count 11, rape by fraud on Count 21, and aggravated statutory rape on Count 25. In its election of offenses, the State described this offense as anal sex at the Defendant's home "on a date in the late summer, early fall, 2006 prior to the victim becoming employed at Academy Sports" and, further, as occurring "a short time prior to the victim's 16th birthday. This is the last time they had sex at this location." The proof established that (1) the victim turned sixteen in October *2005* and (2) the victim became employed by Academy Sports shortly before he turned *seventeen* in October 2006. Thus, the election referred to a single event as occurring in two different years. However, the election clarified that the episode referred to was the "last time they had sex at this location." Moreover, as with the election for Counts 4 and 14 and Counts 5 and 15, the State may have further clarified the incident during its closing argument. We hold that the proof is sufficient to support these convictions and, further, that, for the same reasons set forth above, the Defendant is not entitled to relief for any inadequacy in the State's election as to these offenses. Therefore, we affirm the Defendant's convictions on Counts 11, 21, and 25.

Finally, the jury convicted the Defendant of rape by force or coercion on Count 12, rape by fraud on Count 22, and aggravated statutory rape on Count 26. In its election, the State described this incident as "the victim penetrated the defendant's anus with his penis on a date in early fall of 2006 in the unisex bathroom at Academy Sports[.]" The victim testified that he and the Defendant had sex at this location on two occasions. The election does not specify which occasion the State was electing, but, again, the State may have corrected this problem during its closing argument. We hold that the proof is sufficient to support these convictions and that the Defendant is not entitled to relief on his argument that the State's election as to these offenses was inadequate. Accordingly, we affirm the Defendant's convictions on Counts 12, 22, and 26.

The Defendant makes no argument and cites to no authority regarding the sufficiency of the evidence as to Count 23, upon which the Defendant was convicted of forgery. We, nevertheless, hold that the evidence is sufficient to support this conviction. "A person commits an offense who forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a) (2006). To forge a writing means to "[a]lter, make, complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act." Id. § 39-14-114(b)(1)(A)(I). The proof at trial established that the Defendant forged a letter purporting to be from Dr. Pinnock. The proof also established that the Defendant created the letter with the intent of enabling him to engage in illegal sexual penetration with the minor victim, conduct harmful to the victim. Therefore, we affirm the Defendant's conviction of forgery.

*Sentencing*

The Defendant complains that his sentences are excessive because (1) the trial court gave "inordinate weight" to enhancement factors and (2) the enhancement factors applied by the court are not supported by the evidence. The Defendant also contends that his sentences on Counts 4, 5, and 8 violate double jeopardy because "[t]he evidence adduced at trial is insufficient to conclude that counts 4, 5, and 8 are separate incidents." The Defendant is not entitled to relief on this latter issue because we have determined, as set forth above, that the evidence is sufficient to support the Defendant's convictions on Counts 4, 5 and 8.

We also note that the record on appeal contains a transcript of the witnesses' testimony at the sentencing hearing but does not contain any of the exhibits thereto, including the presentence report and the victim's written statement.[13] As set forth above, it is the appellant's responsibility to compile an adequate record that allows meaningful review on appeal.

Proof and Findings from Sentencing Hearing

Mark Madison, one of the Defendant's younger brothers, testified that the Defendant "is a caring human being who has a great, great compassion for people." He described the Defendant as "totally remorseful" about the events that led to his convictions. According to Mr. Madison, the Defendant "acknowledged that he should have never did what he did" with respect to his relationship with the victim. Mr. Madison testified that the Defendant's family "stands willing to stand behind him as he takes responsibility" for his crimes.

---

[13] After oral argument, this Court allowed the Defendant to supplement the record with additional material from the sentencing proceedings. The record, nevertheless, remains incomplete.

The victim testified that he had suffered emotionally from the Defendant's crimes and that he had enrolled in counseling to deal with his emotional problems. On cross-examination, the victim acknowledged that he had been in treatment with a psychologist prior to meeting the Defendant. He explained that this earlier counseling was the result of his "making bad grades in middle school."

Bobby Denegal testified that he was the Defendant's uncle. Mr. Denegal accused the Defendant of having forged a signature to a family will. Mr. Denegal sought a warrant against the Defendant for "[f]raudulently having the will probated" but admitted that he had been unsuccessful in obtaining the warrant. He also testified that, in conjunction with the dispute over the will, the Defendant had threatened to have him arrested for raping one of the Defendant's sisters. Mr. Denegal testified that it had been his experience that the Defendant is "an evil, conniving individual that ha[s] swindled [Mr. Denegal's mother] and others out of their life savings."

Reverend Menjou C. Miller, Sr., testified that he met the Defendant through the Sulphur Springs AME Church several years previously. Rev. Miller testified that, during the time that he had known the Defendant, he had "presented himself . . . as a perfect gentleman."

The Defendant gave an allocution during which he acknowledged that he "should have behaved as an adult," that, as the adult, he was "responsible," that he was "deeply sorry" and "regret[ted] any harm or pain [he had] caused the victim, the victim's family, [his] family, and [his] church." The Defendant also denied the allegations levied against him by Mr. Denegal. He emphasized that he engaged in no inappropriate conduct during the twenty months he was on bail awaiting trial. He asked for the opportunity to be rehabilitated and to "earn back [his] self-respect." He stressed that he was "not a predator."

After the sentencing hearing, the trial court sentenced the Defendant as a standard Range I offender. The trial court sentenced the Defendant to the minimum term of eight years on each of his rape convictions[14] on Counts 1 and 2.[15] The trial court sentenced the

_____

[14] Rape is a Class B felony. Tenn. Code Ann. § 39-13-503(b) (2003, 2006). The sentencing range for Range I offenders convicted of Class B felonies is eight to twelve years. Id. § 40-35-112(a)(2) (2003, 2006).

[15] The trial court explained its decision to impose the minimum sentence on Counts 1 and 2 as follows:

> Although not addressed at the sentencing hearing, the Court notes that counts one and two occurred prior to the amendment by 2005 Tenn. Pub. Act Chapter 353 Section 18 which made enhancement factors advisory for sentencing purposes on crimes occurring on

(continued...)

Defendant to the midrange term of eleven years on each of his remaining rape convictions, and to the maximum four year term on each of the aggravated statutory rape convictions,[16] relying on enhancing factors for "particularly great" injuries suffered by the victim and for the Defendant's abuse of a position of trust. See Tenn. Code Ann. § 40-35-114(6), (14) (Supp. 2005, 2006). The trial court sentenced the Defendant to the maximum sentence of two years on the forgery conviction, a Class E felony,[17] relying upon the same enhancement factors. The trial court then merged Counts 3 through 12 (rape by force or coercion) with Counts 13 through 22 (rape by fraud), respectively; merged Count 24 (aggravated statutory rape) with Counts 10 and 20; merged Count 25 (aggravated statutory rape) with Counts 11 and 21; and merged Count 26 (aggravated statutory rape) with Counts 12 and 22.

Initially, we note that the judgment orders on the Defendant's convictions do not reflect the mergers ordered by the trial court. We therefore remand this matter to the trial court for correction of the judgment orders to reflect the ordered mergers.

As to manner of service, the trial court found that "confinement is necessary in this case to avoid depreciating the seriousness of the offenses and [to] provide deterrence to the defendant and other individuals." The court found further that the Defendant

> continues to minimize his role in the events and maintains in his evaluation that "he was coerced into [the sexual incidents with the victim] by the boy." He claims the teenage victim threatened him if he were to stop the relationship. The [D]efendant continued to sexually abuse the victim in Sumner County after the incidents in this indictment and threatened the victim and his mother with jail (a type of extortion). The defendant also made veiled threats against the victim's life (e.g., "you have put yourself in danger. . . . your last spring break, . . . your time is running out.") The defendant also obtained a forged arrest warrant against the victim. Having heard the trial testimony, the Court does not find this version of events credible and finds the [D]efendant is not amenable to treatment or probation.

---

[15](...continued)
or after June 7, 2005. There was no proof presented to the jury for enhancement purposes of these two counts, therefore the Court must place the sentence at the minimum in the range.

[16] Aggravated statutory rape is a Class D felony. Tenn. Code Ann. § 39-13-506(d)(3) (2006). The Range I sentencing range for Class D felonies is two to four years. Id. § 40-35-112(a)(4).

[17] See Tenn. Code Ann. § 39-13-114(c).

As to whether the Defendant should serve his sentences concurrently or consecutively, the trial court first referred to Tennessee Code Annotated section 40-35-115(b)(5), which allows for the imposition of consecutive sentences when

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim . . . , the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim[.]

Tenn. Code Ann. § 40-35-115(b)(5) (2006). In view of this statutory provision, the trial court found as follows:

> [The sexual abuse] occurred over a three year time span with acts of abuse occurring weekly which included at least twenty occasions of anal sex beginning when the victim was fourteen years old and the defendant was forty-six years old. The Court finds the nature and scope of the offenses, which included anal intercourse of the defendant and oral penetration of the victim and the viewing of pornography with the minor victim[18] further demonstrates the aggravated nature of the offenses. Additionally, the Court finds that the extent of mental damage to this victim was great as the evidence indicated the victim suffered extensive emotional trauma necessitating counseling and continues to suffer confusion about his own sexuality because of the abuse at the hands of the defendant.

(Footnote added). In light of its findings, the trial court ordered the eleven-year sentence imposed on Count 4 to be served consecutively to the eleven-year sentence imposed on Count 5, the eleven-year sentence imposed on Count 5 to be served consecutively to the eleven-year sentence imposed on Count 8, and the eleven-year sentence imposed on Count 8 to be served consecutively to the two-year sentence imposed on Count 23, for a total effective sentence of thirty-five years.[19]

---

[18] The proof at trial included references to the Defendant and the victim viewing pornography together.

[19] The sentences imposed on the rape convictions must be served at 100%. See Tenn. Code Ann. § 40-35-501(i)(1), (2)(G), (3) (2006).

Analysis

In making its sentencing determination, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006). The trial judge should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2006).

Where the record affirmatively shows that the trial court considered the statutory sentencing principles and all relevant facts and circumstances, our review is de novo with a presumption that the trial court's determinations are correct. See Tenn. Code Ann. § 40-35-401(d) (2006); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). And, where the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and [the record establishes] that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). When the record does not demonstrate that the trial court gave due consideration to the requisite criteria, our review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169. The appealing party, here the Defendant, bears the burden of establishing that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts; see also Ashby, 823 S.W.2d at 169. The record in this case establishes that the trial court considered the statutory sentencing principles and all relevant facts and circumstances

and that its findings are supported by the proof. Therefore, our review is de novo with a presumption that the trial court's determinations are correct.

As to the substantive aspects of the trial court's sentencing decisions, we first consider the trial court's application of enhancement factors. We emphasize that, as to offenses committed after June 6, 2005, enhancement factors are advisory only and that, while a trial court is required to consider them, the trial court is not bound by them. Tenn. Code Ann. § 40-35-114 (2006). When the proof supports application of an enhancement factor, the weight to be afforded the factor is left to the trial court's discretion. See State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008); State v. Wanda Elaine Brock, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *10 (Tenn. Crim. App. Mar. 16, 2011).

With respect to enhancement factor (6), applicable where the victim's personal injuries are "particularly great," Tenn. Code Ann. § 40-35-114(6), we reiterate that the record before us is incomplete as to the trial court's assessment that the victim suffered particularly great injuries. The transcript of the portion of the sentencing hearing conducted on October 1, 2009, reflects that the victim submitted a written statement. That statement is not in the record.[20] Nor is the presentence report or any of the other materials admitted as exhibits to the sentencing hearing. It is the appellant's responsibility to compile the record on appeal that will allow this Court to address the issues raised. Tenn. R. App. P. 24(b). When the necessary materials are not included in the record on appeal, we presume the trial court's ruling was correct. Griffis, 964 S.W.2d at 592-93. Therefore, the Defendant is entitled to no relief as to his claim that the trial court erred in applying enhancement factor 6.

We next consider enhancement factor 14, which may be applied when the defendant abuses a position of trust. According to our Supreme Court, when the defendant is an adult and the victim is a minor,

> application of [this] factor requires a finding, first, that defendant occupied a position of trust, either public or private. The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith. If

---

[20] See footnotes 12 and 13, supra.

the evidence supports that finding, then the court must determine whether the position occupied was abused by the commission of the offense.

State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996).

We hold that the proof supports the trial court's application of this factor. The victim testified that he met the Defendant at the church that the victim had been attending his "whole life." The Defendant was active in the church and became a friend of the family. The victim testified that he considered the Defendant to be his mentor. They spent considerable time together, including attending the Defendant's family functions together. The victim's mother trusted the Defendant sufficiently to suggest the victim spend the night with him when she had to travel out of town for her work. The victim testified that he "believed everything that [the Defendant] told [him] because . . . everything he told [him] was always the truth. So [he] was lead [sic] on [by] a pretty good and complete person." This proof established that the Defendant stood in a position of private trust vis-a-vis the victim.

Relying on these two enhancement factors, the trial court imposed eleven-year terms, one year short of the maximum, for the Defendant's convictions of rape by force or coercion and rape by fraud. The record reflects no error by the trial court in imposing these terms. Similarly, we find no error in the trial court's imposition of the maximum four year term on each of the Defendant's three convictions of aggravated statutory rape, or in its imposition of the maximum two year term on the Defendant's conviction of forgery on Count 23. Accordingly, we affirm the length of the sentences imposed on the Defendant's convictions on Counts 3 through 26. We also affirm the Defendant's sentences on Counts 1 and 2, for which the trial court imposed the minimum term of eight years.

The Defendant raises no specific argument as to the trial court's imposition of consecutive sentences, and we see no issue based upon our review. Accordingly, we hold that the trial court did not err in ordering that the Defendant serve some of his sentences consecutively.

## Conclusion

We affirm the Defendant's convictions and sentences. This matter is remanded to the trial court for correction of the judgment orders as set forth above.

_____
JEFFREY S. BIVINS, JUDGE